# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CARLA KARLEN, CARLA KARLEN | : | |
| as next friend on behalf of minor children | : | |
| J.K. and D.K., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | 3:07-cv-309 (CFD) |
| | : | |
| WESTPORT BOARD OF EDUCATION, | : | |
| ELLIOTT LANDON, CYNTHIA | : | |
| GILCHRIST, KAYE MAY, LORRAINE | : | |
| DINAPOLI, | : | |
| Defendants. | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiffs, Carla Karlen ("Carla") and Carla as next friend on behalf of her two minor

children, J.K. and D.K.,[1] bring this lawsuit against the defendants Westport Board of Education

(the "Board"), Superintendent of Schools Elliott Landon ("Landon"), Westport Director of Pupil

Services Cynthia Gilchrist[2] ("Gilchrist"), and the Department Chair of Special Education at

Staples High School Lorraine DiNapoli ("DiNapoli"), alleging, *inter alia*, racial discrimination

under Title VI of the Civil Rights Act, the Equal Protection Clause of the Fourteenth

Amendment, First Amendment retaliation, and intentional infliction of emotional distress under

Connecticut law.[3]

---

[1]Although Carla Karlen is the only plaintiff here, her husband will also be referenced. Gerard Karlen is Carla Karlen's husband and the father of the two children. The parties will be referred to at times as Carla and Gerard.

[2]"Gilchrist" or "Gilchrest." See Affidavit of Cynthia Gilchrest, Exhibit E to defendants' motion for summary judgment.

[3]All claims against the defendant Kaye May, have been dismissed.

Carla Karlen and her children are residents of Westport, Connecticut. D.K. and J.K. attend public schools in the Westport Public Schools (also referred to as "School District"). J.K. is Carla Karlen's son; D.K. her daughter. D.K. is approximately four years older than her brother.[4] Carla Karlen is African American and her husband (and the father of D.K. and J.K.) is white.

The Board of Education supervises and operates the Westport Public Schools. It is a recipient of federal funding under Title VI.

Elliot Landon served as the Superintendent of the School District during the years relevant to this litigation

Cynthia Gilchrist served as Director of Pupil Services for the School District during the years relevant to this litigation. In this role, she oversaw the provision of special education services in the School District.

Lorraine DiNapoli was the Department Chair of Special Education at Staples High School, the high school in the School District, during the years relevant to this litigation.

The Court assumes the parties' familiarity with the ruling of July 29, 2009 on the motions to dismiss [Dkt. # 90]. This ruling considers the motion for summary judgment by defendants Landon, Gilchrist, and the Board [Dkt. # 47], several arguments still pending from the motions to dismiss, and the plaintiffs' motion to amend the amended complaint [Dkt. # 91].[5]

---

[4]The Court has previously permitted the children to be identified only by their initials.

[5]The defendants have also filed a motion to strike portions of the plaintiffs' affidavits and exhibits submitted in response to the motion for summary judgment [Dkt. # 62]. The motion to strike is denied; however, the Court will consider only those statements in the plaintiffs' Rule 56 statement and exhibits that are supported by evidence in resolving the motion for summary judgment, as required by Fed. R. Civ. P. 56. See, e.g., Ricci v. Destefano, No. 3:04CV1109

## I.    Background[6]

J.K. and D.K. have attended the Westport public schools since 1998.  A detailed chronology of their attendance at various Westport schools is necessary to understand the involvement of numerous individuals related to the case, some of whom are defendants here. D.K. attended Coleytown Elementary from 1998 through 2001 (grades one through three); J.K. attended Stepping Stones preschool in the Coleytown Elementary School building from 1999 through 2001.  Both children attended Long Lots Elementary School from 2001 to 2003 (D.K.'s grades four and five, J.K.'s kindergarten and grade one).  J.K. attended Long Lots for an additional year (second grade, from 2003 to 2004), while D.K. began sixth grade at Bedford Middle School but transferred to a private school, Phoenix Academy, midway through the year. J.K. also transferred to Phoenix Academy in fall 2004, for his third grade year.

Both children returned to the Westport public schools in 2005.  J.K. attended fourth and fifth grades at Long Lots Elementary School from 2005-2006 and sixth grade at Bedford Middle School from 2007-2008.  D.K. attended Bedford Middle School from 2005-2007, where she repeated eighth grade, and Staples High School from 2007-2008 (ninth grade).

The following is a summary of the alleged discrimination by the Westport Board of Education, Superintendent Landon, and the other defendants.

---

(JBA), 2006 WL 2666081, at *2-3 (D. Conn. Sept. 15, 2006).  Because the plaintiffs' remedies under IDEA have not been exhausted, the Court also omits from this discussion claims relating to the provision of a free and appropriate public education, as described in the ruling on the motions to dismiss [Dkt. # 90].

[6]The facts related herein are taken from the parties' Rule 56 statements, depositions, affidavits and supporting exhibits and are undisputed except where otherwise noted.  References to the "complaint" in this ruling refer to the Second Amended Complaint [Dkt. # 67].

## A. Allegations of Discrimination or Harassment of J.K.

*Kindergarten - Long Lots Elementary School (2001 - 2002)*

On one occasion, a boy said to J.K. that "Blacks shouldn't live in Westport; they're only really good for making stuff in factories." J.K. did not report the incident to the school, but testified at his deposition that he told his mother. The plaintiffs claim that the same boy made other racially charged comments to J.K., which Carla and Gerard reported to Barbara Lasher, the principal at Long Lots. On another occasion, the same boy told J.K. that he was not black, but a white person with a tan. J.K. told his teacher about the comment, and the boy apologized as a result.

When asked about that school year during her deposition, Carla replied that it was "a very good year" and a "peaceful" year. Carla Karlen Dep. 62:24-63:9, April 28, 2008, ECF No. 58, Ex. A.

*First Grade - Long Lots Elementary School (2002 - 2003)*

The plaintiffs claim several incidents occurred in first grade, when J.K.'s teacher Jacque O'Brien allegedly (1) attempted to force J.K. to repeat first grade due to his young age despite his receiving high grades, (2) forced J.K. (but apparently not any other students) to remove his bandana, and (3) "bullied" and even "laid hands" on J.K. on several occasions. The defendants agree that O'Brien enforced a school policy banning bandanas against J.K. J.K. stated that in doing so, though, O'Brien pushed him and told him to stop crying. The plaintiffs make several allegations about the nature of this incident and of their conversations with O'Brien which are unsupported by any evidence apart from statements by Carla which are not based on her personal knowledge. For example, the plaintiffs allege that the no-bandana policy was not enacted until

after the incident.

*Second Grade - Long Lots Elementary School (2003 - 2004)*

One boy called J.K. "weird" and a "freak" regularly during second grade; the boy also pushed J.K. On one occasion a student called J.K. the "N" word, but J.K. did not report this to anyone at the school. On another occasion a boy told J.K. he was not black. Carla contacted the principal, Barbara Lasher, about these incidents. In response, Lasher sent an e-mail to the staff at Long Lots Elementary School, which said in part:

> This e-mail is in the FYI category, and I'm passing it along in case you see a teachable moment in which this issue would fit as you're working with students. Today a mom called to relay that her son was upset because a classmate, very innocently it seems, told him he was not 'black.' Mom asked that we find a way to continually reiterate to children that you can't tell what someone 'is' or 'is not' by looking at them. I did try to reassure her that this concept is part of our Westport curriculum and that [Long Lots] consciously infuses diversity awareness throughout the day. But Mom's point is certainly valid.

Carla Karlen Aff. November 17, 2008, ECf. No. 58, Ex. B-7. Overall, the plaintiffs agree, J.K. had a relatively good second grade year, and had no problems with his second grade teacher, Ms. Sweeney.

*Third Grade - Phoenix Academy (private school) (2004-2005)*

*Fourth Grade - Long Lots Elementary School (2005 - 2006)*

J.K. was teased on at least two occasions in fourth grade. Once, a boy said J.K. was "weird," that his hair was weird and that he looked like a hippie. J.K. told a teacher, and the boy stopped teasing him as a result. On another occasion, a boy said J.K. "shit in his viola case." J.K. told the principal, who told J.K.'s teacher; the boy was made to apologize. J.K. stated that three secretaries at Long Lots were rude to him.

On a school field trip to a museum in New York City, J.K. was "lost" by a parent

chaperone briefly, despite Carla's prior request that he be accompanied throughout the day by the teacher, Ms. Sullivan, to prevent such an incident from occurring. Carla and Gerard sent a letter to Superintendent Landon about the incident on June 20, 2006. Carla states in her affidavit that Landon responded by denying the incident and attesting to the character and accomplishments of Ms. Sullivan. The defendants claim that Landon or another administrator to whom he delegated the task investigated this and all other incidents reported by the Karlens. Neither the plaintiffs nor the defendants have offered evidence supporting their account of the response to the museum incident.

Gerard Karlen wrote a letter to several school administrators, including Landon and Gilchrist, on December 16, 2005 expressing his concern about an incident involving J.K. and another girl who allegedly punched J.K. in the face. He also wrote a letter on May 4, 2006 to J.K.'s teacher, Ms. Sullivan, complaining about her practice of holding J.K.'s hand when leading the class to and from various activities.

*Fifth Grade - Long Lots Elementary School (2006 - 2007)*

In the fall of 2006, despite Carla Karlen's request that J.K. be placed in a classroom where he had friends, J.K. was placed in a classroom in which he had no friends. J.K.'s request to be placed in a higher math class was denied by his teacher, Ms. Bell.

J.K. was disciplined on several occasions, and the plaintiffs claim that J.K. was disciplined more harshly than other students. For example, the assistant principal, Mr. Brophy, detained J.K. longer than another boy with whom J.K. had been arguing. Gerard Karlen appears to have sent a letter about this incident to Cheryl Dwyer, the principal of Long Lots (who apparently succeeded Barbara Lasher) on October 9, 2006. On another occasion, J.K. was

required to apologize to his teacher, Ms. Bell, for calling her by her first name. J.K.'s cell phone was occasionally taken away until the end of the day, as was done for other students with cell phones. Another time J.K. accidentally kicked another boy in his "private area" and was required to write the boy an apology. On one occasion, J.K. was sent by his Spanish teacher, Mr. Griffin, to Assistant Principal Brophy's office, escorted by another student. This incident appears to have resulted from J.K.'s refusal, despite Mr. Griffin's orders, to move to the back of the line when boarding the school bus on the ride home the previous day. According to an October 9, 2006 letter sent by Gerard Karlen to Principal Dwyer, Mr. Brophy required J.K. to either apologize to Mr. Griffin in front of the class, or write Mr. Griffin a letter of apology. A copy of the October 9 letter appears to have been sent to Superintendent Landon. Once, J.K. was forced to stay in for lunch after tripping and appearing to jump off the stage at graduation. Gerard wrote a letter about this incident to Karen Griffin, Acting Principal of Long Lots (who apparently succeeded Cheryl Dwyer) on June 18, 2007.

*Sixth Grade - Bedford Middle School (2007 - 2008)*

In sixth grade, J.K. was initially placed in a low math class, but was transferred to a higher math class. On one occasion, the art teacher, Mr. DiFranco, relocated students' backpacks without telling them. When J.K. confronted the teacher about this, he was kept after class. J.K. testified that Mr. DiFranco "picked on him."

On several occasions (from fourth through sixth grades), other students teased J.K. for being smart, liking music, and not liking sports; other students called him "gay." J.K. was also called a "loser" on at least one occasion. Both J.K. and the girl who called him and his friends a "loser" were required to apologize to each other by school administrators.

-7-

With the exception of the bandana incident with his first grade teacher, J.K. stated in his deposition that he does not believe that any actions of the employees of the school district towards him were racially motivated.  J.K. Dep. 58:21-59:22, April 23, 2008, ECF No. 58, Ex. 7.

**B.      Allegations of Discrimination or Harassment of D.K.**

*First Grade - Coleytown Elementary School (1998 - 1999)*

On one occasion in first grade, D.K. was physically assaulted by another girl in the school bathroom.  The girl slapped D.K. in the face, grabbed D.K.'s shirt and pushed and shook D.K. against the wall.  D.K. ran away and back to class, but did not report the incident.  The other girl reported to Principal Kaye May that D.K. started the fight.  Both girls were required to apologize to each other.  D.K. was not disciplined further.  A fourth-grade girl regularly teased, chased, and/or pushed D.K. in first grade, made fun of D.K.'s hair, and made fun of D.K.'s fear and quietness.  D.K. did not report the bullying.  Wendy Friedman (a friend of Carla's and a fellow parent) recalled one party on school premises where parents (including Carla) mingled, but no one, including administrators and staff, spoke to Carla.  Friedman Aff. ¶ 12, November 17, 2008, ECF. No. 58, Ex. D.

During the time D.K. was at Coleytown, Wendy Friedman (who was volunteering at the time), observed that on the playground, groups of children excluded D.K. from activities, and mistreated the two children, during at least one incident.  Friedman observed that there were "always school personnel (i.e. teachers or aides) on the playground to supervise.  However, they never intervened to help the Karlen children when they were being mistreated."  Friedman Affidavit, ¶ 10.

*Second Grade - Coleytown Elementary School (1999 - 2000)*

On one occasion during second grade, D.K. had trouble zipping up her jeans after using the bathroom, and exited the bathroom while still attempting to close the zipper. Another boy made fun of her, causing the class to laugh at her. The teacher told D.K., "You need to go to the bathroom to do that next time." D.K. perceived the teacher's response as a reprimand. Also during second grade, D.K. was teased by a girl who called her a "green donut," then a "brown donut," and a "poodle" because D.K. wore her hair in two ponytails. Other students regularly called D.K. "loser," called her "white with a tan," picked on her, or ignored her. D.K. told her school therapist that the students were making fun of her skin color. The Karlens complained to the principal, Kaye May, and to Charlotte Janis (an assistant principal) regarding the racially-based teasing.

*Third Grade - Coleytown Elementary School (2000 - 2001)*

During D.K.'s third grade year, D.K. was the only student of color in her class. Her teacher, Mrs. Dow, is alleged to have done several insensitive and cruel things that publicly humiliated D.K. For example, she told D.K., whom she knew could not read well, to read aloud from a poetry book D.K. had brought for a class show-and-tell assignment. As a result, the whole class became aware of D.K.'s difficulty in reading. Ms. Dow also told D.K. in front of the class that "If you cannot read or write, then you will fail in life." Ms. Dow refused to let D.K. use the bathroom on several occasions, resulting in two or three "accidents."

Prior to leaving for a school field trip, D.K. complained of a headache and stomach pain, but was not allowed to go to the nurse. When the students returned to school after the field trip they returned earlier than originally planned. Parents were notified of the early arrival time by notes sent home with the students, but Carla claims that she alone was not informed about the

early return. As a result, D.K. was placed alone on a bus home that day, despite being ill and having no one to meet her at the bus stop near her home. Carla had left home to go wait at the school, at the time she had expected the students to arrive. Gerard wrote letters complaining about this incident to Superintendent Landon on January 20, 2001 and January 23, 2001.[7]

The plaintiffs allege that D.K. suffered teasing and injury at the hands of other students during her third grade year. Gerard Karlen wrote letters to Landon dated March 5, 2001 and March 22, 2001 describing at least four incidents of alleged teasing that involved physical contact or injury to D.K. during February and March.[8]

*Fourth and Fifth Grades - Long Lots Elementary School (2001 - 2003)*

D.K. began receiving special educational services in fourth grade. The fourth and fifth grades passed without incident.

*Sixth Grade (first semester) - Bedford Middle School (2003)*

D.K. started the year at Bedford Middle School. Some students teased and made fun of D.K. None of the allegations implicate any explicit racial slurs or references to her hair or skin color. D.K. transferred to Phoenix Academy, a private school, in the middle of sixth grade. She returned to the Westport public school system in 2005 to attend eighth grade.

*Seventh Grade - Phoenix Academy (private school) (2004-2005)*

*Eighth Grade - Bedford Middle School (Repeated: 2005 - 2006 and 2006 - 2007)*

---

[7]In the letter, Gerard does not claim racial bias. He also stated "our daughter often misplaces memos and other notices."

[8]In the letter of March 22, Gerard suggests that race may have been a reason for the conduct of students, and threatens a lawsuit against the Board of Education. However, he does not list racial discrimination among the causes of action he intends to assert.

D.K. did not have problems during her first year in eighth grade. During the 2006 - 2007 school year, one boy teased D.K., calling her "weird" and a "loser" and teased her for her hobby of making a sort of plastic knotted lanyard called a "gimp." In January 2007 a girl hit D.K. on the head with a water bottle. D.K. suffered a concussion. The other girl said she did not mean to hurt D.K. and apologized; she was not disciplined.

D.K. testified that she told her math teacher, Mr. Cuccaro, about some of the teasing. Mr. Cuccaro would reprimand the boy who teased D.K., force him to apologize, and sometimes send that boy out of class. The plaintiffs claim that the school administrators did not adequately respond to these incidents.

*Ninth Grade - Staples High School (2007 - 2008)*

D.K. had conflicts with and was teased by several boys during ninth grade. The boys would talk during class, crack jokes while D.K. was talking, shout at D.K., and make fun of her. She also had conflicts with teachers, who (1) failed to grant her request for additional time to hand in an assignment; (2) failed to call on her in class; (3) became angry with D.K. when she left her assignment in her locker; (4) failed to provide sufficient assistance with D.K.'s work; and (5) assigned her monitored study during her hour-long free period rather than merely issuing a warning for skipping one of her classes. D.K. believed that her teachers in ninth grade didn't like her, weren't very nice, and excluded her from conversations.

**C.    Allegations of Discrimination or Harassment of Carla**

Carla alleges that the racial discrimination against herself and her children began in 1999 when she claims she was told by Charlotte Janis, an assistant principal at Coleytown, that minority children bussed into Westport schools from Bridgeport were allegedly kept in a separate

classroom. Carla claims that Coleytown principal Kaye May confirmed this alleged segregation. The defendants deny that May made such a statement and that the Bridgeport students were segregated. Carla subsequently notified the local news media about the alleged segregation. Carla also states that teachers at Coleytown Elementary stopped speaking to her after she saw Coleytown's principal, Kaye May, speaking to J.K.'s teacher and the director of the preschool. During J.K.'s second year at the preschool, parent-teacher conferences with Carla were required to take place with open doors and an administrator (in addition to the teacher) present.[9]

Carla's request to read Maya Angelou poetry during Black History Month in February 2000 at Coleytown was denied. Carla claims Principal May told her that Coleytown did not celebrate Black History Month, and worked instead to implement African American history into the curriculum throughout the year. Gerard and Carla wrote a letter on February 8, 2000 to Assistant Superintendent Lynne Shain expressing their discontent with Coleytown's refusal to celebrate Black History Month. May responded to the letter on February 14, 2000, noting that the school celebrates the accomplishments of African Americans throughout the year and celebrated Martin Luther King Day the previous month. Carla alleges that her activism relating to these issues, and her efforts to tell the local media about the alleged segregation, are a large part of the reason for the school administrators' negative treatment of her and her children.

Carla's requests that D.K. be placed in a class with other children of color during D.K.'s years at Coleytown were denied, Carla maintains. Carla told Superintendent Landon during the 2000 - 2001 school year that she felt uncomfortable at Coleytown because she believed she was

_____

[9]Claims of discrimination by Ms. May were dismissed as outside the limitations period. See Ruling on Motions to Dismiss, July 29, 2009, No. 3:07-cv-309, ECF No. 90.

being followed and stared at because of her race. The defendants deny that any staff member was ever directed to follow Carla or otherwise monitor her actions. Carla's conversations with Tracy Peterson, an African-American teacher at Coleytown, contributed to Carla's discomfort at the school. Peterson claimed that she had been asked by May to switch from teaching fourth grade to teaching third grade in anticipation of D.K.'s arrival and with the hope she would be D.K.'s teacher, and that May had asked Peterson if she could "handle" Carla Karlen. During the fall of 2000, Wendy Friedman was asked by Ms. Dow, D.K.'s third-grade teacher, to "keep a watchful eye on Carla." Friedman Aff. ¶ 16. The defendants deny that any teachers were reassigned to "handle" Karlen or that anyone was asked to watch her. Carla alleges that school administrators always sat in on her parent-teacher conferences, but did not always sit in on parent-teacher conferences with other parents or with Gerard.

During the time that J.K. and D.K. attended Phoenix Academy, Carla received calls from administrators at Long Lots Elementary, demanding to know where the children were attending school and warning that keeping the children out of school was illegal. Carla considered these calls harassing.

On one occasion during the summer of 2006, Karlen was stopped and questioned by Fred Rapcinsky (a school employee) in a school parking lot while attempting to pick up D.K. from a summer special education program. Rapcinsky and another man followed Karlen into the school when she entered to pick up D.K. Karlen claims that these two men harassed her as a result of racial targeting, and that Gerard Karlen was not treated in the same way when he went to the same parking lot to drop off D.K. at the program. The defendants claim that the school decided to limit the use of the driveway area to pick-up and drop-off of children with physical handicaps,

that this policy was administered equally to all, and that Carla was asked to leave the area because she was parked or her car was standing in the reserved driveway area.

During the 2006-2007 school year, Karlen claims, school administrators sat in on parent-teacher conferences with Karlen. School administrators did not attend the parent-teacher conferences of other parents. Karlen claims that school teachers and administrators (for example Mr. Brophy, a vice principal at Long Lots Elementary) repeatedly harassed her.

In October 2007, Carla Karlen discussed the special education needs of D.K. with DiNapoli, Department Chair of Special Education at Staples High School, which D.K. attended during ninth grade (from 2007-2008). DiNapoli then filed a police complaint against Karlen, claiming that Karlen had threatened her. DiNapoli directed Karlen that only written communications would be accepted by the Westport Board of Education, referencing without evidence Karlen's alleged abuse, threats, and issues. Carla Karlen claims she was prohibited from calling or appearing at D.K.'s school, though no other parents were subject to this treatment.[10]

This action was filed in February, 2007.

## III.    Applicable Law and Discussion

The issues and claims remaining for consideration under the motion for summary judgment and other motions are:

(a) Whether the plaintiffs may amend the Second Amended Complaint;

(b)  Whether acts alleged to have occurred prior to February, 2004 are barred by the

---

[10]DiNapoli has also prevented Karlen from having a "Behaviorist" (whom Karlen hired at her own expense) observe D.K. at school. This, like other allegations relating to claims that are barred by the failure to exhaust administrative remedies under IDEA, are omitted.

statute of limitations, or whether they form part of a "continuing violation;"

(c) Whether some of the claims are barred by plaintiffs' failure to exhaust administrative remedies under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1414;

(d) Claims of racial discrimination, in violation of Title VI, by the Board against D.K. and J.K.;

(e) Claims of racial discrimination, in violation of the Equal Protection Clause and 42 U.S.C. § 1983, by Landon, Gilchrist, DiNapoli, and the Board, against both children and Carla;

(f) Claims of intentional infliction of emotional distress against Landon, Gilchrist and DiNapoli;

(g) Whether the individual defendants are entitled to qualified immunity, and whether the Board is entitled to governmental immunity under Monell v. Dep't of Soc.Servs. of the City of New York, 436 U.S. 658 (1978).

**A. Summary Judgment Standard**

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue

for trial," <u>Anderson</u>, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. <u>Anderson</u>, 477 U.S. at 255; <u>Graham</u>, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." <u>Carlton</u>, 202 F.3d at 134. Consistent with this standard, all evidence favorable to the nonmoving party must be credited if a reasonable jury could credit it. Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached. <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150-51 (2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. <u>Sologub v. City of New York</u>, 202 F.3d 175, 178 (2d Cir. 2000).

### B. Motion to Amend Complaint

Plaintiffs filed their third motion to amend the complaint on October 21, 2009. The proposed additional paragraphs of the amended complaint allege that in April 2009, DiNapoli informed Carla and Gerard Karlen that D.K. would be required to take a foreign language course, even though they had been led to believe that was not a requirement; that since March 2009, DiNapoli has refused to tell D.K. and her parents about tests such as the PSAT test; that since October 2008 D.K. has been required by her gym teacher to sit in the pool are during gym class, despite her chlorine allergy; that since October 2008 the Board has required that Carla have an

escort when she visits the Bedford Middle School; and that in April 2009, Landon issued a written directive instructing the entire district staff not to speak directly with Carla or Gerard Karlen.

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party may amend its pleading only with the court's leave, and that "the court should freely give leave when justice so requires." However, the Supreme Court has articulated a list of reasons why a court, in its discretion, may deny leave to amend a complaint. Among those reasons are "undue delay." Foman v. Davis, 371 U.S. 178, 182 (1962). Most of the events alleged in the amendment to the complaint are said to have occurred in the spring of 2009. However, plaintiffs did not seek leave to amend the complaint before the oral argument on summary judgment motions in July 2009, nor did plaintiffs raise the new information in the proposed amendment at that oral argument. Instead, they waited another three months until October 2009 to move to amend the complaint. Under the circumstances of this case, this constitutes undue delay. See Zahra v. Town of Southold, 48 F.3d 674, 685-86 (2d Cir.1995) (request to amend complaint was filed two and a half years after the original complaint); Ansam Associates v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985) (discovery had already been completed and non-moving party had already filed a motion for summary judgment). For these reasons, the Court declines to grant leave to amend the Second Amended Complaint, and the motion is denied.

### C.    Statute of Limitations

The defendants argue that many of the claims should be barred under the three-year statute of limitations for § 1983 actions, and this Court has already dismissed all claims against Kaye May individually, as none of the claimed conduct by her occurred within three years of the

commencement of this case in February, 2007.  As to the other defendants, however, a question remains as to whether their alleged conduct prior to February, 2004 could be considered under the "continuing violation" theory.  Under the continuing violation doctrine, "if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001) (citations and internal quotation marks omitted).

As to defendants Landon and the Board, the plaintiffs base their claims of racial discrimination on a "deliberate indifference" theory, discussed in detail below.  Although plaintiffs claim that racial harassment—and the defendants' deliberate indifference to it—began in the 1998-99 school year, the plaintiffs also allege incidents of harassment that occurred within the three-year limitations period. It is possible, therefore, that an attitude of deliberate indifference (if one existed) by the defendants also continued into the three-year period that predates the filing of this lawsuit.  The plaintiffs make allegations that this attitude of indifference (exhibited at least by Landon) continued when the children returned to the Westport schools from a private school, and at least partially resulted from continuous animosity toward Carla and her family as a result of Carla's speech about the alleged segregation of the children bussed from Bridgeport.  Accordingly, the Court will consider all the remaining allegations relating to the Board and to Landon, not only those within the three-year limitations period.

**D. Exhaustion of Administrative Remedies**

As the Court previously ruled on July 29, 2009 on the motions to dismiss [Dkt. # 90], it does not have jurisdiction to consider claims seeking relief available under IDEA prior to the

exhaustion of administrative remedies. As a result, claims arising out of the provision of appropriate educational services to D.K. and J.K are barred.  Such claims were brought against defendant Gilchrist, who is the Director of Pupil Services for the Westport schools.  She is not alleged to have had any personal contact with J.K. or D.K., and the claims against her relate only to the failure to provide appropriate educational services for the children – not to independent and unrelated acts of racial discrimination.  It is not alleged she was indifferent to allegations of racial discrimination by other students or administrators to the children, nor that she was responsible for responding to such allegations on behalf of the Board, if she had known of them.  Finally, she is not alleged to have committed any racially discriminatory acts toward Carla.  Therefore, there are no genuine issues of material fact remaining in any claim against Gilchrist, and the motion for summary judgment as to her is granted. The remaining claims against the Board, Landon and DiNapoli will now be addressed.

### E. Race Discrimination Claims

Plaintiffs bring claims of race discrimination by the Westport Board of Education, Superintendent Landon, and DiNapoli under Title VI, the Equal Protection Clause, and §1983. "Title VI," or 42 U.S.C. § 2000d, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  Id.  Because the Board is the only defendant who receives federal funding, only the Board may be held liable for a Title VI violation. See Ruling on Motions to Dismiss.

A plaintiff alleging racial discrimination in violation of the Equal Protection Clause must show intentional discrimination rather than mere discriminatory effect.  Washington v. Davis,

426 U.S. 229 (1976); Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977) (discriminatory purpose must be at least a "motivating factor" in the decision, even if not the dominant or primary consideration); Alexander v. Sandoval, 532 U.S. 275, 285 (2001). An Equal Protection Clause claim requires the plaintiffs to establish (1) that they were treated differently than others similarly situated; (2) the differential treatment was motivated by an intent (a) to discriminate on the basis of race, (b) to punish or inhibit the exercise of constitutional rights, or (c) by a malicious or bad faith intent to injure the person. Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000).

To make a § 1983 claim, the plaintiffs must allege both the violation of a constitutional right and that the deprivation was committed by a person acting under color of state law. Monroe v. Pape, 365 U.S. 167 (1961). An individual defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority; he must have been personally involved in the alleged conduct. See, e.g., Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). "Personal involvement" for these purposes can mean direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates. Id. A municipal defendant in a §1983 action, such as the Board in this case, may only be held liable for damages for constitutional violations if the violations were taken pursuant to a municipal policy or custom. Monell v. Dep't of Soc.Servs. of the City of New York, 436 U.S. 658 (1978).

Because many of plaintiffs' allegations of racial discrimination involve incidents in which the individual defendants were not present or directly involved, plaintiffs principally rely on a

theory that the defendants were "deliberately indifferent" to the discrimination, and that their

failure to respond rises to the level of a Title VI or constitutional violation. Deliberate

indifference to known instances of student-on-student racial harassment is a viable theory of

liability against boards of education and school administrators under both Title VI and the

Fourteenth Amendment. Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 140 (2d

Cir. 1999); Bryant v. Independent Sch. Dist. No. 138 of Garvin County, OK, 334 F.3d 928, 934

(10th Cir. 2003) This is because, in cases of student-on-student racial discrimination, only

deliberate indifference to such treatment can be viewed as discrimination by the school officials

themselves. Gant, 195 F.3d at 140. The test for proving deliberate indifference to race

discrimination borrows from the Supreme Court's test for deliberate indifference to sex

discrimination under Title IX. The individual defendants must have "actual knowledge" of the

harassment. Davis v. Monroe County Bd. Of Educ., 526 U.S. 629, 642-645 (1999). Also, the

defendant's response, or lack of response, to the harassment must be "clearly unreasonable in

light of the known circumstances." Id. at 638; see also Gant, 195 F.3d at 141. "In an appropriate

case, there is no reason why courts, on a motion . . . for summary judgment . . . could not identify

a response as not 'clearly unreasonable' as a matter of law." Id. (quoting Davis 526 U.S. at 649).

Having summarized the applicable legal principles, the Court will now assess these

claims of race discrimination against the Board, Landon and DiNapoli.

### 1. "Deliberate Indifference" by the Board and Landon to Racial Harassment of  D.K. and J.K.[11]

---

[11] Of course, the Court must evaluate the evidence separately with regard to each minor
plaintiff, D.K. and J.K. One plaintiff may not establish deliberate indifference based on
defendants' responses to incidents only involving the other sibling.

Plaintiffs bring claims against the Westport Board of Education under Title VI, and against both the Board and Landon under the Equal Protection Clause of the Fourteenth Amendment, and §1983. To make a claim of "deliberate indifference" under Title VI or the Equal Protection Clause, plaintiffs must first show that the Board or Landon had "actual knowledge" of the harassment of D.K. and J.K. Second, plaintiffs must show that the Board or Landon's response was "clearly unreasonable."

Landon, of course, only has "actual knowledge" of those communications the Karlens made to him personally. The analysis for the Board, however, is somewhat different, and borrows from the framework for analyzing Title IX claims. See DT v. Somers Central School Dist. 348 Fed.Appx. 697, 698-700 (2nd Cir. 2009) ("Because Title VI and Title IX use parallel language, we construe them similarly."). While the Supreme Court has rejected the application of *respondeat superior* liability for school boards in cases such as this, the Karlens need not show they contacted individual members of the school board with their concerns. Instead, the Board had "actual knowledge" of the alleged harassment of D.K. and J.K. if an "appropriate person"—an official of the Westport Public Schools who at a minimum had the authority to address the alleged discrimination and to institute corrective measures on the Board's behalf—was notified of the harassment. Gerber v. Lago Vista Independent School Dist., 524 U.S. 274 (1998). See also, Doe ex rel. A.N. v. East Haven Bd. Of Educ., 430 F. Supp.2d 54 (D.Conn., 2006) (Droney, J.). The case law has yet to precisely define exactly who must be told about discrimination for a school board to have "actual knowledge." See, e.g., Hawkins v. Sarasota County School Bd., 322 F.3d 1279, 1286 (11th Cir. 2003) (stating whether notice to a teacher constitutes actual knowledge on the part of the school board to be "an open question"); Roe v.

<u>Gustine Unified School District</u>, 678 F. Supp. 2d 1008, 1034 (E.D. Cal. 2009) (concluding that identifying which adults must notified of harassment for the purposes of a school district's liability is "necessarily a fact-based inquiry.") In this case, the facts show that at the very least, (1) Superintendent Landon, and (2) the principals of the Westport schools the Karlen children attended, had the appropriate authority to address the incidents the Karlens reported. Thus, communications to those individuals about harassment of the Karlen children constitute "actual notice" to the Board. Also, only those communications that allege some form of *racial* harassment can constitute "actual notice" for the purposes of a Title VI claim.[12]

Having determined which communications gave the Board "actual notice," the next inquiry for the Court is whether or not the responses to these allegations were "clearly unreasonable." Considering the facts in the light most favorable to the plaintiffs, the communications from the Karlens to either Superintendent Landon or a Westport school principal that allege racial discrimination, and the responses that followed, are:

1. During the 1999-2000 school year, the Karlens communicated with the principal of Coleytown elementary school about teasing D.K. endured. D.K. said in her deposition the teasing in second grade was about "my hair, the color of my skin even . . . They said I was white with a tan, or they, like made up names like mocha and stuff like that." D.K. testified in her deposition

---

[12]The Karlens brought many incidents to the attention of school officials without alleging that any racial harassment or discrimination had occurred. (See Background section, above.) To take just one example, Gerard Karlen wrote two letters to Superintendent Landon about a field trips D.K. took. The time the students were to return to school had been changed, but Carla was not notified. As a result, no one was at school to pick up D.K. when she returned from the trip, and she took the bus home. When she arrived, no one was there, and she waited with a stranger until Carla returned home. Although this letter relays a mistake by D.K.'s teacher, it does not allege any incidents of racial discrimination. As a result, it cannot constitute "actual notice" of racial harassment to Landon or the Board.

that she told the principal of Coleytown elementary school about these incidents. After these incidents, she met several times with the principal and the school therapist.

2. In 2001, the Karlens told the principal of Long Lots Elementary School about students teasing J.K. When J.K. was in kindergarten, another student told him on the bus that "Blacks shouldn't live in Westport; they're only really good for making stuff in factories." Also, that student told him he was "just a white person with a tan." J.K. testified in his deposition that he told his mother about the comments and "I think that she reported it to the school." In her affidavit, Carla Karlen said that both she and her husband reported the comments to the principal. After the incident, J.K.'s kindergarten teacher spoke to the other student and made him apologize (at least for the comment about being white with a tan).[13]

3. In a letter dated March 22, 2001 from Gerard to Landon, Gerard described three incidents involving alleged injuries to D.K. caused by other students. In one incident, D.K. was poked with a pencil, in another she was accidently hit in the eye during recess, and in the third incident a student pushed a desk into her, causing a bruise. This is the first letter that notes the Karlens' belief that D.K. was being targeted by other students because she is bi-racial and has a different appearance than either black or white students, including because she has unusual hair. After the desk incident, both D.K. and the other student were called into a meeting in the principal's office. Later that day the principal spoke with Gerard, explaining what she had found out about the incident. Gerard wrote in his letter to Superintendent Landon that although D.K. felt powerless, "this is not intended as a criticism of Ms. May [the principal]. She took appropriate action by calling the meeting and, I believe, made her determination in good faith."

---

[13]See J.K. Dep. 17:14-20:7.

4. Gerard wrote a letter dated July 3, 2001 to Landon regarding the Karlens' request that their children be transferred to Long Lots. The reason for the request, he said, was D.K.'s becoming a "target" at Coleytown due to "racial bias and hostility" toward Carla. Superintendent Landon's assistant sent a reassignment form to the Karlens, and the reassignment was granted. The children began the following school year at a new elementary school, Long Lots. In response to Gerard's allegations of racial bias and the transfer request, Superintendent Landon wrote the following:

> I also note with concern your statement that you 'demanded this reassignment because my daughter became a target at the Coleytown Elementary School due to racial bias and hostility towards my wife.' As you know, I personally met with you and Mrs. Karlen, and I investigated the circumstances related to your request for transfer. It was my decision ultimately to grant your request, given your concerns. I wish to be clear, however, that I did not find any evidence to suggest any racial bias against Mrs. Karlen, you or your children. I hope that this clarification of my findings is helpful to you. We do not and would not tolerate racial bias in the Westport Public Schools. Should you have any concerns in the future, please bring them forward so that the Administration may conduct any necessary investigation.

Landon Letter to Gerard Karlen, August 1, 2001, ECF No. 47, Ex. K.

5. In 2003, the Karlens brought another incident to the attention of the Long Lots principal. When J.K. was in first grade, he came to school wearing a bandana, and his teacher forced him to remove it. While Carla Karlen said in her affidavit that "at no time did I ever state that a bandana was indicative of African American culture," the Karlens felt J.K. was singled out, and that no other students had been asked to remove their bandanas. J.K. stated in his deposition that he felt this incident was racially motivated. Carla spoke with the principal, Barbara Lasher, about the incident, and wrote a letter to the principal dated May 9, 2003. According to the letter, the principal spoke with Carla twice after the incident. She also proposed "opening a dialogue"

between J.K. his teacher, and the school psychologist, which Carla refused.  In a separate letter a few days earlier to the assistant principal, Carla wrote, "Thank you for your time and patience regarding this entire matter.  No reply to this letter is necessary unless you feel a need to respond." Carla Karlen letter to Karen Griffin, May 5, 2003, ECF No. 58, Ex. B-5.

6. In 2004, the Karlens spoke with the Long Lots principal about an incident where a student called J.K. the "N" word and said J.K. wasn't black.  Carla called the principal and spoke to her about the incident on the phone.  After their conversation, the principal sent out an email to the school's teachers in which she said she was relating what happened to J.K. "in case you see a teachable moment in which this issue would fit as you are working with students." She also said the classroom teacher (presumably J.K.'s) "expertly folded the issue" into a class discussion that day.

7. Gerard sent letter dated December 16, 2005 to the principal of Long Lots Elementary School (and copied to Landon and other administrators), regarding an alleged incident where a student punched J.K. in the face in fourth grade, but J.K. was disciplined, while the other student was not.  The letter includes the following statement: "In the United States, we have a particularly long and ugly history of blaming the victim when the victim's ethnicity is non-white and the victim's gender is male."  While there is no evidence that the principal took any steps in response to Gerard's letter, at the time of the incident the teacher did ask J.K. what happened and reported the incident to the administration.

8. In three letters dated October 9, 2006 from Gerard to Landon and to Cheryl Dwyer, principal of Long Lots Elementary School, Gerard complained of "discriminatory and racially motivated actions against [J.K.], [D.K.], and my wife," including the alleged discipline of J.K. by

Mr. Griffin, J.K.'s fifth grade Spanish teacher, which occurred after J.K. refused to move to the back of the school bus line. After the incident, the assistant principal spoke with Carla about it in person. After that, Carla had a meeting with both the assistant principal and the principal. Gerard Karlen also met in person with both the assistant principal and principal. The following day, Mr. Griffin, the Spanish teacher, spoke to J.K. and apologized.

This evidence, taken in the light most favorable to the plaintiffs, shows that teachers, assistant administrators, principals and Superintendent Landon were receptive to the Karlens' concerns, and took numerous steps to address the issues the Karlens' raised. Although the Karlens do not agree with all the disciplinary choices made by the school officials, this Court must give deference to school administrator's decisions. See Davis, 526 U.S. at 648 (noting that Courts must "refrain from second-guessing the disciplinary decisions made by school administrators.") Although school officials did not successfully prevent or eradicate all hurtful comments made or inappropriate behavior toward J.K. and D.K., the legal standard here does not require that. Id. at 648, (holding that the deliberate indifference standard does not require a "remedy" to peer harassment or ensuring "that students conform their conduct" to certain rules.) In response to the Karlens' concerns about their children, school officials had meetings with them in person, spoke over the phone in the evenings, sent email and mail correspondence, and allowed the children to transfer to another school within the district. No reasonable jury could find that these responses to allegations of harassment were "clearly unreasonable" and that the defendants were *deliberately* indifferent to these allegations. Because this Court concludes that no reasonable fact-finder would find that any individual official was deliberately indifferent to claims of racial harassment of either D.K. or J.K., the claims of deliberate indifference by the

Board and Landon fail. See, e.g., DT 348 Fed.Appx. 967 (finding that when teachers and assistant principals responded to incidents in ways that were not clearly unreasonable, the school district and the superintendent were not deliberately indifferent to those incidents); Barmore v. Aidala, 2006 WL 1978449 at *10 (N.D.N.Y. 2006) ("[T]he lack of deliberate indifference by any individual school official, and therefore the lack of an actionable violation of Plaintiff's constitutional rights, defeats the claim against the District.")

The Court grants summary judgment for the Board on the children's Title VI claim. Because the same allegations underlie the §1983 claim against the Board, the Title VI claim "subsumes" the §1983 claim, and summary judgment on that claim is also granted in favor of the Board.[14] Because Landon was sued not under Title VI, additional discussion of the claims against Landon is required.

### 2. Direct Race Discrimination Against D.K. and J.K. by Landon

Plaintiffs argue that Landon was not only deliberately indifferent to student-on-student racial harassment of D.K. and J.K., he also engaged in direct racial discrimination against both children. Therefore additional analysis beyond the "deliberate indifference" framework is warranted. Plaintiffs allege Landon gave "active instruction to his direct reports that created and maintained the culture of retaliation." Pl.'s Mem. of Law in Opp'n. to Mot. for Summ. J. 30, November 17, 2008, ECF. No. 57. Although plaintiffs do not elaborate on what the "instruction"

_____

[14]See DT v. Somers Cent. School Dist., 588 F.Supp.2d 485 (S.D.N.Y. 2008) ("Put simply, plaintiffs have already invoked the comprehensive enforcement scheme in Title VI as a means to redress the same alleged violations of federal rights that underlie their § 1983 claims. The Title VI claim, thus, subsumes their § 1983 claims and, therefore, plaintiffs' § 1983 claims cannot withstand the instant motion for summary judgment. Thus, the Court need not consider the parties' arguments regarding Monell.") aff'd 348 Fed.Appx. 967 (2nd Cir. 2009).

was and who Landon's "direct reports" are, presumably plaintiffs are alleging that Landon told employees of the school district that he supervises to retaliate against D.K. and J.K. for Carla's actions. But this allegation is unsupported by any evidence whatsoever. "Reliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). Plaintiffs concede that Landon never had any personal interactions or communications with either child. Because plaintiffs cannot make the required showing in §1983 claims of any "personal involvement" by Landon in any direct discrimination of J.K. and D.K., the Court grants summary judgment for Landon on the children's Fourteenth Amendment claims brought pursuant to §1983.

### 3. Race Discrimination Against D.K. by DiNapoli

DiNapoli (the Department Chair of Special Education at Staples High School) has not filed a motion for summary judgment; however, her previous motion to dismiss was denied without prejudice for reconsideration as part of this ruling. Several of the allegations in the complaint relating to DiNapoli's alleged discrimination against D.K. are barred by the failure to exhaust the IDEA's administrative remedies, as described in the Court's ruling on the motions to dismiss. The remaining allegations explicitly or at least plausibly concerning discrimination are that DiNapoli "has taken an aggressive hard line with the plaintiffs," that she required Carla to communicate with the Board only in writing and prohibited Carla from calling the school or appearing there in person, and that DiNapoli failed to adequately respond to any oral, written or in-person requests by the plaintiffs. Under the "plausibility" standard applicable to a motion to dismiss, these claims plausibly state a claim for racial discrimination through deliberate

indifference as to D.K.[15]  Thus, DiNapoli's motion to dismiss is denied as to the claims brought by D.K.  DiNapoli may move for summary judgment, though.

The remaining claims against DiNapoli relate to her treatment of Carla, and are dismissed below.

### 4.  Race Discrimination against Carla Karlen by Landon and DiNapoli

The allegations of racial discrimination against Carla arise under the Fourteenth Amendment and are not subject to the same "deliberate indifference" analysis as the allegations pertaining to D.K. and J.K.  In order to state a discrimination claim under the Equal Protection Clause, Ms. Karlen must not only allege differential treatment, but also that differential treatment was motivated by an intent (a) to discriminate on the basis of race, (b) to punish or inhibit the exercise of constitutional rights, or (c) by a malicious or bad faith intent to injure the person.  See Diesel, 232 F.3d at 103. The only individual defendants against whom allegations of racial discrimination remain as to Carla are Landon and DiNapoli.

As to Landon, Carla alleges that between 2006 and 2007, school administrators sat in on parent-teacher conferences at Landon's instruction, while they did not attend the parent-teacher conferences of other parents. Carla also points to an incident with a parking lot attendant who allegedly would not let her park in the usual spot when she came to pick up D.K. as evidence of racial discrimination.  Carla filed a criminal complaint, and also left a voice mail message for Landon regarding the incident, but claims he never returned her calls.  Landon testified that he spoke with the parking lot attendant, as well as the police chief, and determined that no racial targeting occurred.  Considering this evidence in the light most favorable to the plaintiffs, there is

_____

[15]The complaint contains no allegations of racial discrimination by DiNapoli against J.K.

no genuine issue of material fact as to whether these allegations were motivated by racial animus. While Carla almost certainly had some tense interactions and upsetting moments with officials in the Westport schools, "the law is ineffective to compel friendship or courtesy." Id. at 104. The incidents, when viewed in the light most favorable to the plaintiffs, cannot support their claims where there is no evidence that Landon was motivated by an intent to discriminate on the basis of race, violate constitutional rights, or otherwise injure the plaintiffs. In this case, there is no genuine issue that the allegations lack the discriminatory nexus required to defeat summary judgment. Accordingly, the motion for summary judgment as to claims of racial discrimination against Carla Karlen by Superintendent Landon is granted.

As to DiNapoli, Carla claims that DiNapoli filed a false police report against her after a telephone conversation in which Carla attempted to discuss the special education needs of D.K., and then subsequently directed (without justification) that only written communications with the Board would be accepted from Carla in the future. No motion for summary judgment has been filed as to DiNapoli – only a motion to dismiss. Under the "plausibility" standard applicable to a motion to dismiss, this claim is at least plausible. Moreover, material questions of fact exist as to the content of the telephone conversation, and whether it gave DiNapoli a legitimate basis for filing a police complaint against Carla. Under the standard for a motion to dismiss, the claim plausibly alleges personal involvement by DiNapoli; the claim also plausibly alleges that Carla was in this respect treated differently than other parents who may have called to discuss the educational needs of their children, that DiNapoli's response was malicious or intended to injure Carla, and that DiNapoli intended to discriminate on the basis of race or to punish or inhibit Carla's constitutional rights. Of course, on a fuller record, these allegations by Carla may not be

substantiated. Accordingly, the motion to dismiss is denied as to racial discrimination by

DiNapoli against Carla, without prejudice to the filing of a motion for summary judgment as to

the claim of racial discrimination by this defendant.

**F.**      **First Amendment Retaliation by Landon, Board and DiNapoli**

A plaintiff alleging violation of her First Amendment rights must prove (1) she has an

interest protected by the First Amendment; (2) defendants' actions were motivated or

substantially caused by her exercise of that right; and (3) defendants' actions effectively chilled

the exercise of her First Amendment right. Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir.

2001) (citing Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998)); see also Locurto v. Safir,

264 F.3d 154, 166 (2d Cir. 2001) (describing elements of First Amendment Retaliation claim).

As a general rule, speech on "any matter of political, social, or other concern to the community"

is protected by the First Amendment. Mandell v. County of Suffolk, 316 F.3d 368, 383 (2d Cir.

2003) (quoting Connick, 461 U.S. 138, 146 (1983)) (internal quotation marks omitted).

To survive a motion for summary judgment, the alleged chilling effect must be actual and

non-speculative; "[o]nly retaliatory conduct that would deter a similarly situated individual of

ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for

a claim of retaliation." Colombo v. O'Connell, 310 F.3d 115, 117 (2d Cir. 2002); Spear v. Town

of West Hartford, 954 F.2d 63, 67 (2d Cir. 1992). Although temporal proximity between the

protected speech and the alleged retaliation is relevant to the issue of causation, a lapse of time

between the protected speech and the alleged retaliation does not necessarily defeat the existence

of a causal connection between the two events. See, e.g., Mandell v. County of Suffolk, 316 F.3d

368, 383 (2d Cir. 2003).

Carla certainly has a First Amendment right to speak out on issues related to race in the Westport schools, and any other aspect of her children's education. But she has failed to establish the second and third prongs of the test. As to the second prong, which requires that the defendants took actions motivated by Carla's speech, Carla argues that administrators, teachers and aides "were apparently instructed not to speak with her." Pls. Memo. in Opp. to Mot. for Sum. Judg. 35, November 17, 2008, ECF No. 57. In support of this contention, plaintiffs' rely on the following testimony from Carla's deposition:

> When I would come into the school, I found that people were not speaking to me. Teachers who had spoken to me since kindergarten stopped speaking to me. They didn't even say hello in the hallways. One teacher, the kindergarten teacher, Ms. Linder, spoke to me, but told me candidly that she had been told that she couldn't talk to me. And I said, By who? And she said she couldn't discuss it, but you know, that she enjoyed my family and she like us and that she just couldn't get involved.

Carla Karlen Dep. 16:10-19. However, Ms. Linder's statments are (and also contain) inadmissible hearsay testimony, on which a court may not rely when ruling on summary judgment. See e.g., Spiegel v. Schulmann, 604 F.3d 72, 81 (2nsd Cir. 2010) ("It is well established that . . . the district court in awarding summary judgment may rely only on admissible evidence.") (internal citations and quotations omitted). Finally, as to the third prong, Carla presents no specific facts showing an actual chilling effect. As the evidence in this litigation amply shows, Carla and her husband continued over the course of several years to speak out about what they perceived to be racial biases in the Westport school district. No reasonable jury could find that any actions by Landon or the Board had an actual chilling effect on Carla's speech. Accordingly, the motion for summary judgment as to First Amendment retaliation against Carla by Landon and by the Board is granted.

The plaintiffs' First Amendment retaliation claim as to DiNapoli is based on the same acts as the claim against DiNapoli for racial discrimination—that DiNapoli allegedly filed a false police report against Karlen after an October 2007 telephone conversation regarding D.K.'s educational needs, and subsequently sent a letter to Carla directing that only written communication with the Board would be accepted in the future. The complaint alleges that these acts were in retaliation for Carla's speech on a matter of public concern; however, the only such speech occurred in 1999, approximately eight years before the conversation with DiNapoli. Unlike defendant Landon, DiNapoli is not alleged to have had a continuing practice of retaliation against Carla since and throughout the period between 1999 and 2007. Accordingly, the plaintiff has failed to make a plausible allegation as to the causal connection between DiNapoli's conduct and DiNapoli's own attitudes and intent to retaliate for the 1999 speech. Therefore, the claim of First Amendment retaliation as to DiNapoli individually is dismissed. No First Amendment claim has been stated against any defendant as to any alleged protected speech by D.K. or J.K.

## G. Intentional Infliction of Emotional Distress

Under Connecticut law, in order for the plaintiff to prevail in a claim of intentional infliction of emotional distress, she must show: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. Appleton v. Board of Educ., 254 Conn. 205, 210 (Conn. 2000).

The role of the court includes the responsibility to determine whether the allegations of a complaint set forth behaviors that a reasonable fact finder could find to be extreme or outrageous.

Gagnon v. Housatonic Valley Tourism Dist. Commission, 92 Conn.App. 835, 847, 888 A.2d 104 (2006). Extreme and outrageous conduct is that which "exceeds all bounds usually tolerated by decent society." Appleton, 254 Conn. at 210. Liability for intentional infliction of emotional distress requires conduct "of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." DeLaurentis v. New Haven, 220 Conn. 225, 267, 597 A.2d 807 (1991), quoting Petyan v. Ellis, 200 Conn. 243, 254 n.5, 510 A.2d 1337 (1986). "Thus, it is the intent to cause injury that is the gravamen of the tort." Id., quoting Hustler Magazine v. Falwell, 485 U.S. 46, 53 (1988) (internal quotation marks and brackets omitted).

Just as the above discussion demonstrates that Landon's alleged actions or failures to act do not support a racially discriminatory motive, there is no genuine issue of material fact that Landon did not intentionally inflict emotional distress upon the plaintiffs. In other cases, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Appleton, 254 Conn. at 210-11, citing Restatement (Second), Torts § 46, comment (d), p. 73 (1965). Taking the facts of this case in the light most favorable to the plaintiffs, Landon was presented with the plaintiffs' objections to many incidents involving J.K. and D.K. In many cases, Landon investigated the allegations and met with Mr. and Mrs. Karlen. When Mr. Karlen requested one of his children be transferred to another school, Landon granted that request promptly. Thus, the plaintiffs have not alleged conduct that is sufficiently "extreme and outrageous" to constitute intentional infliction of emotional distress. Id. at 210, citing Petyan, 200 Conn. 253. Since there is no genuine issue of material fact in this regard, Landon is entitled to summary judgment.

On the other hand, DiNapoli is accused of falsely authoring a police report about Mrs. Karlen on the basis of her race. Since material questions remain as to whether that alleged conduct could constitute intentional infliction of emotional distress, the motion to dismiss by DiNapoli on this count is also denied.

### H. Qualified Immunity for the Remaining Claims

Since the Court grants summary judgment for defendants the Board, Landon, and Gilchrist, it declines to reach the question of whether those defendants would be entitled to either qualified or governmental immunity. Only claims against DiNapoli remain.

Di Napoli, as a government official sued in her individual capacity, is entitled to qualified immunity if "plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred" or if "the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." Distiso v. Town of Wolcott, No. 05cv1910, 2006 WL 3355174 at *5 (D. Conn. Nov. 17, 2006) (internal citations omitted). Of course, Carla Karlen's right not to be subject to racial discrimination is clearly established. Based on her allegations that DiNapoli filed a false police report against Karlen because of her race, such actions could not be considered "objectively legally reasonable." Accordingly, DiNapoli is not entitled to qualified immunity on this record.

### III. Conclusion

The plaintiffs' claims of racial discrimination are serious allegations and require careful examination. In this case, over the course of nearly a decade, plaintiffs had numerous conversations and sent multiple letters to defendants, objecting to the way Westport school

officials handled situations involving Carla and their children.  In these communications, plaintiffs made general allegations of racial discrimination.  However, the evidence does not support the claims that the defendants were deliberately indifferent to allegations of racial discrimination, or that plaintiffs were being mistreated on the basis of their race. A careful reading of the evidence submitted demonstrates that summary judgment is appropriate in this case, as to these defendants.

For the foregoing reasons, the Motion for Summary Judgment [Dkt. # 47] is GRANTED as to defendants Gilchrist, Landon, and the Board of Education.  The claim of First Amendment retaliation against DiNapoli is dismissed.  The Motion to Strike [Dkt. # 62] is DENIED.  The Motion to Amend the Amended Complaint [Dkt. #91] is DENIED.

The motion to dismiss by DiNapoli [Dkt. # 68], which was denied without prejudice in the Court's previous ruling, has been reconsidered and remains DENIED (with prejudice) as to claims of racial discrimination by DiNapoli against Carla and D.K.


So ordered this  30th  day of September, 2010 at Hartford, Connecticut.


 /s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**